IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JUAN JOSE ZUNO (GODINEZ) a/k/a   :  CIVIL ACTION
RAFAEL ESPINOSA a/k/a      :
RAFAEL ESPINOSA NAPOLES a/k/a  :
RAFAEL E. NAPOLES       :
                :
                :
   v.            :
                :
                :
WAL-MARK STORES, INC.;     :  NO. 06-2392
WAL-MART STORES EAST, INC,;   :
WAL-MART STORES EAST, LP, and   :
WAL-MART REALTY COMPANY    :

## <u>MEMORANDUM AND ORDER</u>

M. FAITH ANGELL           May 29, 2009
UNITED STATES MAGISTRATE JUDGE

   On December 5, 2006, the parties in this matter filed a notice of consent to have me conduct

all further proceedings in this action. *See* Docket Entry No. 23. On January 8, 2007, the Honorable

Clifford Scott Green ordered that the case be referred to me for all further proceedings and entry of

judgment. *See* Docket Entry No. 25.

   Presently before this Court is the Motion for Summary Judgment of Defendants Wal-Mart

Stores, Inc.; Wal-Mart Stores East, Inc.; Wal-Mart Stores East, LP, and Wal-Mart Realty Company[1].

In their motion for summary judgment, Defendants argue that Plaintiff Juan Jose Zuno (Godinez)

a/k/a Rafael Espinosa a/k/a Rafael Espinosa Napoles a/k/a Rafael E. Napoles[2] cannot establish a

*prima facie* claim of negligence against any of the Wal-Mart entities. *See* Defendants' Memorandum

---

[1] Hereinafter Wal-Mart Defendants.

[2] Hereinafter Mr. Zuno.

of Law in Support of Defendants' Motion for Summary Judgment[3] at 24.  Mr. Zuno responds that

Wal-Mart Stores, Inc.; Wal-Mart Stores East, LP, and/or Wal-Mart Stores East, Inc. breached the

duty of care owed to Zuno.  He additionally asserts that there are questions of fact regarding the

capacity in which the Wal-Mart Defendants were involved at the site herein.  *See* Plaintiff's

Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment[4] at 15-16.  Upon

consideration of this motion, Plaintiff's response, Defendants' supplemental memorandum and

Plaintiff's response, the record, and the applicable caselaw, and as discussed more fully below,

Defendants' motion will be granted.

## I. FACTUAL BACKGROUND[5]

I begin by presenting the facts, drawing all reasonable inferences in favor of Plaintiff, the

non-moving party.  *See e.g. Hamilton v. Leavy, et al.*, 322 F.3d 776, 782, n. 4 (3d Cir. 2003);

*Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

Mr. Zuno was employed by Hansen-Rice, Inc.[6], a roofing contractor hired by Wal-Mart

Stores, Inc. and/ or Wal-Mart Stores East, LP as the Metal Building Contractor for the Wal-Mart

---

[3] Hereinafter Defendants' Memo.

[4] Hereinafter Plaintiff's Memo.

[5] The factual history is compiled from a review of the original record of the Court of Common Pleas of Philadelphia County; Defendants' Answer to the Complaint; the Amended Complaint; the Joint Answer to the Amended Complaint; the Amended Answer to the Amended Complaint; Defendants' Motion for Summary Judgment, and the memorandum in support of the motion, inclusive of all exhibits thereto; Plaintiff's Response in Opposition to the Motion for Summary Judgment, his memorandum in support of the response, with exhibits; Defendants' Supplemental Memorandum in Support of the Motion for Summary Judgment; Plaintiff's Reply to the Supplemental Memorandum, and the record of this Court.  All facts, and inferences therefrom, are considered in the light most favorable to the non-moving party.

[6] Hereinafter Hansen-Rice

Mechanized Distribution Center[7] in Pottsville, Pennsylvania. *See* Plaintiff's Exhibit O to Plaintiff's Response to Defendants' Motion for Summary Judgment.[8]; Plaintiff's Exhibit P; Defendants' Exhibit D to Defendants' Motion for Summary Judgment.[9]   On or about July 27, 2005, at approximately 3:35 p.m., Plaintiff was performing metal deck roofing work on the roof of one of the buildings at the Center when a storm approached.

A general warning about the approaching storm was broadcast over the Wal-Mart radio system, so Mr. Zuno and his co-workers began to secure loose materials on the roof and evacuate the roof. *See* Plaintiff's Exhibits EE and MM.  When the storm hit, the ferocity of the rain and wind caused objects on the roof to fly about. *See* Plaintiff's Exhibit EE.

As Plaintiff ran to exit the roof, he was struck by a metal roof sheet and was blown off the roof. *See* Plaintiff's Exhibits EE and MM.  He was taken by ambulance to the Hershey Trauma Center where it was determined that Mr. Zuno had suffered numerous bone fractures to his arm, face, and leg, but he had received no internal organ damage, nerve damage or internal bleeding. *See* Plaintiff's Exhibit MM.

## II. **MOTION FOR SUMMARY JUDGMENT**

In their motion for summary judgment, Defendants assert that they cannot be liable to Mr. Zuno because he cannot establish a *prima facie* claim against any of the Wal-Mart Defendants. Defendants argue that Wal-Mart Stores, East, Inc. and Wal-Mart Realty were not involved in the construction of the Center.  Further, they assert that Plaintiff's injuries were caused by his employer,

---

[7] Hereinafter the Center.

[8] Hereinafter Plaintiff's Exhibit.

[9] Hereinafter Defendants' Exhibit.

Hansen-Rice, not Wal-Mart Stores, Inc. and Wal-Mart Stores, East, LP.  *See* Defendants' Motion for Summary Judgment[10] at 4, 12-13.

## III. <u>DISCUSSION</u>

### A. Legal Standard

Summary judgment is appropriate only where there exists no genuine issue as to any material fact, such that the moving party is entitled to judgment as a matter of law.  *See* F.R.C.P. 56(c).  "An issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Moyer v. Borough of North Wales*, 2001 WL 73428 at *1 (E.D.Pa. January 25, 2001) (*citing Anderson v. Liberty, Inc.*, 477 U.S. 242, 248 (1986)).  "A factual dispute is 'material' if it might affect the outcome of the case governing law."  *Moyer*, 2001 WL 73428 at *1 (*citing Anderson*, 477 U.S. at 248).

"The party seeking summary judgment always bears the initial responsibility for informing the Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact."  *Moyer*, 2001 WL 73428 at *1 (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  After the moving party has met its initial burden, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial."  *Moyer*, 2001 WL 73428 at *1 (*citing Celotex Corp.*, 477 U.S. at 322).  "Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing 'sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial.'"  *Moyer*, 2001 WL 73428 at *1 (*citing Celotex Corp.*, 477 U.S. at 322).

---

[10]Hereinafter Defendants' Motion.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative. "When considering whether there exists genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment and resolve all reasonable inferences in that party's favor." *Wishkin*, 476 F.3d at 184.

### B. Analysis

1. Duty as Landowner[11]

While Defendants assert that they cannot be liable to Mr. Zuno because he was employed by Hansen-Rice, not any of the Wal-Mart Defendants, Plaintiff claims that a duty of care was, indeed, owed to him by the Wal-Mart Defendants as he worked to help them complete the Center.

In order to prevail on a cause of action in negligence in Pennsylvania, a plaintiff must show:

> (1) a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct for the protection of others, against unreasonable risks; (2) a failure to conform to the standard required; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting in harm to the interests of another.

*Warnick v. Home Depot U.S.A., Inc.*, 516 F. Supp. 2d 459, 465 (E.D.Pa. 2007). *See also National Railroad Passenger Corporation (Amtrak) v. URS Corporation, et al.*, 2008 WL 2389491 *5 (E.D.Pa. June 10, 2008); *Arce v. U-Pull-It Auto Parts, Inc. t/a Cresent "U-Pull It" Used Auto Parts, et al.*, 2008 WL 375159 *10 (E.D.Pa. February 11, 2008).

"The general rule is that a possessor of land owes a duty to business invitees, such as employees of independent contractors, where a non-obvious dangerous condition exists on the

---

[11]It is admitted that Wal-Mart Stores, East, LP was the owner of the Center at the time of Mr. Zuno's accident. *See* Defendants' Motion, ¶4.

5

possessor's land." *Warnick*, 516 F. Supp. 2d at 465.

> The Restatement (Second) of Torts § 343 dictates that a possessor of land must exercise reasonable care to protect invitees from non-obvious dangerous conditions on the land, as follows:
>> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>> (c) fails to exercise reasonable care to protect them against the danger.
> The land possessor's duty extends to independent contractors as business invitees.

*Arce*, 2008 WL 375159 *10 (internal citations omitted). As pointed out by the Honorable Eduardo

C. Robreno, in *Warnick*, this is a narrow theory of liability.

> Pennsylvania law imposes no general duty on property owners to prepare and maintain a safe building for the benefit of a contractor's employees who are working on that building. Rather, our law generally insulates property owners from liability for the negligence of independent contractors and places responsibility for the protection of the contractor's employees on the contractor and the employees themselves.

*Warnick*, 516 F.Supp.2d at 466 (internal citations omitted).

"A landowner does not have such a duty to inform if the dangers are as obvious to the

contractors as they are to the landowner". *Amtrak*, 2008 WL 2389491 at *5 (internal citation

omitted). "For the duty to attach, the condition must be non-obvious. In addition, there is no duty

if the contractor is in the same position as the landowner to discover the dangerous condition or if

the contractor is the party that created the dangerous condition in the first place." *Warnick*, 516 F.

Supp. 2d at 465-466.  *See also Arce*, 2008 WL 375159 *10.

"A danger is deemed to be 'obvious' when both the condition and the risk are apparent to and would be recognized by a reasonable man, in the position of the visitor, exercising normal perception, intelligence, and judgment. . . . For a danger to be 'known', it must not only be known to exist, but it must also be recognized that it is dangerous and the probability and gravity of the threatened harm must be appreciated.  *Id.*

In *Arce*, 2008 WL 375159 *10, the Honorable Ronald L. Buckwalter mentions a number of examples of obvious hazards.  They include: "visible patches of ice", "the possibility of being hit by a wayward baseball while in the stands at a baseball game",  and "being hit by an elevator by tilting one's head into an elevator shaft".  One may also add to the list of obvious dangers, the possibility of being buffeted about or being struck by flying objects while working on a roof in a severe thunderstorm.  "The inquiry is an objective one, looking from the perspective of a reasonable person."  *Id.*

In order to prevail on a cause of action in negligence in Pennsylvania, Mr. Zuno must first show a duty or obligation that requires one or more of the Wal-Mart Defendants to conform to a certain standard of conduct to protect him, and others like him, against unreasonable risks.  As previously noted, generally, the Wal-Mart Defendants owe a duty to Mr. Zuno, and other employees of independent contractors, where a non-obvious dangerous condition exists on the premises.  The condition must be non-obvious.

The record reveals that the Pottsville area was, and no doubt still is, susceptible to high winds, and, in fact, a probability of high winds was noted for the week in which Mr. Zuno's accident

occurred.[12]  The topic of weather was discussed on numerous occasions.  The probability of high winds for the week was mentioned, for instance, at a Progress Meeting held at the Center on July 5, 2005.  *See* Plaintiff's Exhibit OO.  Patrick Antonio, Wal-Mart's Assistant Construction Manager noted the erratic weather that region of Pennsylvania suffers.

> Q; What was the weather like at that job site?
>
> A: Erratic at best.
>
> Q: Why do you say that:
>
> A: Well, you know I live up that way, right?  And it's on top of a mountain and it's tough.  It's typical northeast Pennsylvania/Poconos-type weather with   and you're sitting on top of a mountain that's about 2000 feet above sea level.

Plaintiff's Exhibit N at 37-38.  Being from the area, Mr. Antonio told others about the wind.[13]

---

[12]Cynthia Ross, Wal mMart's Construction Safety Coordinator testified as follows:

> Q: Midway down the paragraph it says   and this is under Wal-Mart.  It says Thurman started the meeting, but it's as if somebody else was taking these notes because it's not first person.  It says he.  He also advised them on the high wind probability for the rest of the week.  Everything needs to be tied down.  Do you see that sentence   two sentences?
>
> A: Yes.
>
> Q: Do you know that Pottsville as an area that was susceptible to high winds?
>
> A: Yes.
>
> Q: And how is it that you know that?
>
> A: When I visited the site, it was generally windy.  Not extremely windy but generally windy.  And cold.

Plaintiff's Exhibit D, Cynthia Ross' Deposition at 157.

[13]Mr. Antonio testified as follows:

> A: . . . I'm from the area, I know that the top of that mountain gets pretty good wind storms.

Perhaps because of the unsettled weather in the region, the weather was monitored by a number of people at the site.

> Q: In the event of an approaching storm, if Wal-Mart put out over the radio that there was a storm coming, would you expect the Wal-Mart supervisors to walk the site to make sure people were doing what they should do to prepare for the storm?
>
> A: Yes.
>
> Q: Now, if a bad storm - or a storm is coming and that's information from a contractor like Hansen and Rice to Wal-Mart – in other words, a Hansen and Rice guy monitored the weather and said there's a storm coming and then put out a notice on radios. Does it make any difference, in other words, who monitors the weather at the job site?
>
> A: No.  Generally -- and as I think back on this particular project, there were more than one contractor    there was more than one contractor that monitored the weather.  And the safety committee would work as a team to see that this was addressed.  And also Wal-Mart.   They worked together as a team, the Wal-Mart site management and the safety committee and, as needed, the contractors' managers.

Plaintiff's Exhibit D, Cynthia Ross' Deposition at 188.  As further explained by Carlus Nelson, Hansen Rice's Safety Manager:

> Q: Was weather monitored at this job site?
>
> A: Yes, sir.
>
> Q: How?
>
> A: By a computer and NOAA weather radio.

---

> Q: And did you tell this to the contractors who were at the meeting, that they should tie everything down?
>
> A: Yes.

Plaintiff's Exhibit N, Patrick Antonio's Deposition at 61.

9

Q: That's N-O-A-A?

A: Yes, sir.

Q: What computer sites were used to monitor the weather?

A: I used W Underground Weather, www.W Underground; and another one was The Weather Bug.

Q: What information could you get from these sites?

A: Temperature, wind, forecasts.

Q: Updated how often?

A: You have to refresh your contact – I mean it was continuous. You just had to refresh you – I don't know what you call this (indicating). I'm not a computer person.

Q: Okay.

A: Your   your connection.

Q: All right. But would the site only have, for example, the day's forecast placed on it in the morning and then the next morning it would have another one so if things changed during the day, it wouldn't be on there or –

A: No, sir. It's continuous.

Q: It's continuous?

A: Yes, sir.

Q: The NOAA weather radio, how did you hook up with that?

A: It's a warning device. If there's an alert, it goes off.

Q: Through the computer?

A: No. That's a radio, separate.

Q: Who monitored weather at the site?

10

A: I, for one.

Q: Who else?

A: Superintendents, project managers, secretary.

Q: Your secretary?

A: Yes.

Plaintiff's Exhibit Q, Carlus Nelson's Deposition at 70-72; Defendants' Exhibit K at 70-72. Another

mechanism for monitoring the weather was a wind meter used to measure wind speed.[14]

---

[14]Carlus Nelson testified as follows:

Q: Now, during the day, the wind might vary. Would that be accurate?

A: Yes, sir.

Q: So when is the temperature recorded? Is that something you just put down the morning temperature or is that done late in the day or when do you put down the temperature information?

A: I take the temperature in the morning for the low, and then whatever the high was that day, that records there (indicating) and the – the wind speed.

Q: Okay. Wind speed is based on what?

A: The Weather Bug computer. I also have wind meters.

Q: You had a wind meter at the job site?

A: Yes, sir.

Q: Are you the only one that used it?

A: No, sir.

Q: Who else had it?

A: Victor.

Q: And how many of them did you have at the site?

A: Two.

Q: You had one and he had one?

11

Additionally, computer storm tracking systems were used to identify storms, and their location in relation to the Center.  *See* Plaintiff's Exhibit Q, Carlus Nelson's Deposition at 169-170.  Perry Farrar, Hansen Rice's Site Superintendent also testified that the weather was monitored at the Center.

> Q: Was the weather monitored at the Pottsville site:
>
> A: Yes.
>
> Q: By whom?
>
> A: For Hansen-Rice, it was monitored by our safety coordinator and myself.
>
> Q: How did you monitor it?
>
> A: Computer, wind meter.
>
> Q: How did the wind meter work?

---

> A: The superintendents had one, yes, sir.
>
> Q: So it would be more than –
>
> A: Well
>
> Q: Oh, you shared the one with the superintendents?
>
> A: I have a meter; the superintendents have a meter.
>
> Q: And does Victor also have one or does he –
>
> A: Well, he may share with the superintendents.
>
> Q: Okay.  And how does that work?
>
> A: The wind meter?
>
> Q: Yes.
>
> A: Works off the wind velocity, blows the fan, records the reading.

Plaintiff's Exhibit Q, Carlus Nelson's Deposition at 110-111.

A: It would tell you what the winds were.  You take a hand-held meter outside, go up on roofs, and it would tell you – up on roofs or any location on the job site it would give a wind reading.

. . . . .

Q: What would cause you to decide to use it on any given day?

A: To monitor the winds to make sure that our people could work.

. . . . .

Q: When would you use it?

A: When it started gusting.

Q: Okay.  And would you go on the roof to use it or somewhere else?

A: Several locations.

Q: Was there a predetermined or a preset point that you would stop work?

A: 15 to 20 miles an hour depending on location on the job site.

Q: Okay. I know what 15 to 20 miles per hour is, but can you explain location on the job site?  What do you mean by that?

A: Prevailing wind areas.  There's a lot of places on Wal-Mart projects that are protected from winds so you can continue working.

Q: Based either on natural geography, tree lines or based –

A: Building lines, whatever.

Defendants' Exhibit J, Perry Farrar's Deposition at 53-55.  The weather was discussed every day before the men would begin their work.[15]  The contractors were reminded that the mountain

_____

[15]Victor Meraz, Hansen Rice's Roofing Superintendent testified as follows:

Q: Okay. Do you recall the weather being discussed at any morning sessions before the men would take to the roof and begin their work?

A: Yes.

Q: And what about the weather was discussed?

13

sustained high winds. *See* Plaintiff's Exhibit FF, Progress Meeting, 7/5/05. *See also* Defendants'

Exhibit O, Victor Meraz's Deposition at 28.

   The record reveals that at it was evident to all that a storm was approaching the Center on

July 27, 2005. Mr. Brown testified that he knew that a storm was coming about an hour before it hit.

Immediately upon learning of its approach, he radioed all to inform the workers of its coming and

what to do to prepare for it.[16] Mr. Nelson reported that he told Wal-Mart that he had seen a storm

---

   A: Oh, every day it was – if we knew it was going to rain, we let everybody know
   that it was going to rain that day and to keep, you know, work to a minimum or, you
   know, to be checking the area around, especially on the roof.
                                                              ....
   Q: Okay. Was the weather monitored at this job site?

   A: Yes.

   Q: Do you know how?

   A: By Internet.

   Q: Who did that?

   A: Carlos Nelson

   Q: And

   A: And on a daily basis I did as well before we started working. But after that I
   leave that office and stay in the field all day, so –

Defendants' Exhibit O at 27-28.

   [16]Larry Brown, Wal-Mart's Construction Manager testified as follows:

      Q: What had you heard?

      A: There was a storm south of the area that shouldn't – should be there as best as
      I can remember I think it was like – they were saying like it was an hour out.
                                                            . . . . .
      Q: What did you do upon hearing that, anything?

      A: Quite sure that they were, you know, monitoring the weather and make sure that
      they, you know, got their people off and got everything secured before the storm got
      in there.

      Q: How did you do that"

approaching on the radar.  *See* Plaintiff's Exhibit Q, Carlus Nelson's Deposition at 137.  Thurman

Pickering, an Assistant Wal-Mart Construction Manager, put a broadcast over the Wal-Mart radio

that a storm was approaching.  *Id.* at 185.  Mr. Farrar testified that they had been watching a storm

that day.  *See* Defendant's Exhibit J, Perry Farrar's Deposition at 56.  A timeline of the approaching

storm was related later by Robert Cooper, Director of Corporate Services for Hansen-Rice.

> On Wednesday July 27, 2005 we had a very unfortunate accident that
> occurred at approximately 3:35 p.m. at the East side of "A" Building.
> Carlus Nelson and Perry Farrar, our Safety Manager and Construction
> Manager respectfully, were monitoring the weather closely
> throughout the day.  By the radar and weather reports there was a
> storm approaching and was to engage the Pottsville jobsite at
> approximately 3:50 p.m.  At approximately 3:00 p.m. Carlus Nelson
> informed Perry that the storm was approximately 60 miles out from
> the project.  Perry in turn made a radio transmission to Victor Meraz
> the Hansen-Rice, Inc. Roofing Superintendent and instructed him to
> wrap-up work, secure materials, and evacuate the roof in preparation
> for the storm.

Plaintiff's Exhibit, MM, Letter from Robert Cooper to Larry Brown.  In his accident report regarding

Mr. Zuno, Mr. Nelson reiterated that at 3:00 p.m. he had informed Hansen-Rice's Site

Superintendent Farrar of a severe storm approximately sixty miles from the project site, and Mr.

Farrar, in turn, made a radio announcement to their Roofing Superintendent Meraz.  *See* Defendants'

---

A: Over the radio.

Q: What did you say over the radio?

A: I just – what I said now.  I mean, make sure that everything was secured.  You know, if you had high winds, and make sure everything was secured and it wasn't going to be blowing off the roof.

Q: And when did you put that over the radio?

A: Right after I was – right after I heard the call that there was a storm south that had winds in it.

Plaintiff's Exhibit B, Larry Brown's Deposition at 124-125.

Exhibits L and O. In a Witness Statement, Mr. Zuno's co-worker Adam Anderson related that he was informed of the approaching storm, and he and other workers on the roof decided that it was in their best interest to put down their last sheet and secure things. *See* Defendants' Exhibit M.

In order for the duty which Wal-Mart owed to Hansen-Rice, and ultimately Mr. Zuno, to attach, the condition must have been non-obvious. That is hardly the case here. Hansen-Rice was in the same position as Wal-Mart to discover the dangerous condition - the storm. It did realize that a dangerous condition was approaching, and it quickly relayed this information to its employees. Both the condition and risk of this incoming danger were apparent to all those working at the Center, and the actions taken by everyone there indicate that the potential for disaster was clearly recognized. The probability and gravity of the harm a storm of this nature could bring upon the Center were unquestionably appreciated by Hansen-Rice as well as Wal-Mart. This was not a non-obvious condition known only to Wal-Mart.

Because the storm which occurred in Pottsville, Pennsylvania on July 27, 2005, was an obvious danger, known to all at the site, Wal-Mart had no duty to Hansen-Rice or Mr. Zuno that would make it liable to Mr. Zuno for his injuries suffered that unfortunate day. Wal-Mart did not owe Mr. Zuno the duty to warn of non-obvious dangerous conditions that a landowner traditionally owes a business invitee.

2. Duty as Employer of the Contractor[17]

Similarly, "an owner of land who delivers temporary possession of a portion of the land to an independent contractor owes no duty to the employees of the independent contractor with respect

---

[17]Wal-Mart Stores, Inc. and/or Wall-Mart Stores East, LP employed the Contractor Hansen-Rice, the employer of Mr. Zuno. *See* Plaintiff's Exhibit O; Exhibit P.

to an obviously dangerous condition on that portion of the land in the possession of the contractor". *Warnick*, 516 F.Supp.2d at 467 (internal citations omitted).   However, there are two relevant exceptions to this rule: "(1) if the hiring party exercised control over the means and methods of the contractor's work and (2) if the work being performed poses a special danger or is particularly risky." *Id.*

> ### a. "Retained Control Exception"

"The 'retained control' exception applies if the hiring party retains control over the methods and means of the contractor's work." *Id.*  It is not enough that the employer has a general right to order work to stop or to resume, to inspect its progress or to receive reports, to make mere recommendations or suggestions, or to authorize deviations or alterations. The contractor must be so supervised that he is not entirely free to do the work in his own way. *See Warnick*, 516 F.Supp.2d at 467. This exception is construed narrowly. *Warnick*, 516 F.Supp.2d at 468.

Before work began on a Wal-Mart project, there would be a pre-construction meeting which all contractors were required to attend where a variety of site requirements were discussed. Wal-Mart also gave radios to each contractor. *See* Plaintiff's Exhibit Q, Carlus Nelson's Deposition at 36-40. In addition, Hansen-Rice had its own radios with which to communicate with its people. *Id.* at 41. Other than the pre-construction meeting, weekly progress meetings and safety meetings were held as the project progressed. These would be attended by all contractors, as well as supervision people and those responsible for safety from each contractor. *Id.* at 43-44.

Both Thurman Pickering, Wal-Mart's Safety Coordinator, and Ms. Ross were instrumental in dealing with safety issues at the Center. Mr. Pickering held safety meetings. Ms. Ross visited the job site about once a month or once every six weeks as Safety Coordinator. *See* Plaintiff's Exhibit

17

B, Larry Brown's Deposition at 82. Mr. Brown stated that safety was checked every day, though he did not walk the site every day. He also went onto the roof to observe the workers. Both he and Ms. Ross had the authority to order that changes be made if he felt it necessary. He normally would speak to a worker's foreman or superintendent if he had an issue to raise. When he walked the job site, he typically looked for progress and work issues. *See* Plaintiff's Exhibit B, Larry Brown's Deposition at 84-86, 90; Plaintiff's Exhibit D, Cynthia Ross' Deposition at 107, 112-113. Mr. Antonio looked for contract adherence, progress, adherence to the drawings, scheduling, cleanliness and safety issues as he walked the site in his capacity as Wal-Mart's Assistant Construction Manager. *See* Plaintiff's Exhibit N, Patrick Antonio's Deposition at 29. Though Mr. Antonio could enforce OSHA rules during his site surveys, and he could have unsafe equipment removed from the job, he did not have the authority to ask for more equipment. *Id.* at 29-30. Safety violations were noted and reported to the contractors. *See* Plaintiff's Exhibit UU; Defendants' Exhibit F.

However, each "significant contractor" or "prime contractor" at the Center had a full-time Safety Manager whose only duty was to perform safety function. *See* Plaintiff's Exhibit B, Larry Brown's Deposition at 107; Plaintiff's Exhibit D, Cynthia Ross' Deposition at 142. All these safety coordinators formed a committee and made safety recommendations to Wal-Mart. *Id.* at 107-108; *also see* Plaintiff's Exhibit Q, Carlus Nelson's Deposition at 45-47. It was the safety committee members who monitored the weather. *Id.* at 124; Plaintiff's Exhibit D, Cynthia Ross' Deposition at 188. The committee also held weekly job site inspections. *See* Plaintiff's Exhibit Q, Carlus Nelson's Deposition at 112. It was Hansen-Rice that had a roof emergency plan.

Q. Before the accident, was there any roof emergency plan?

A: Yes, there should be.

18

Q: Where was it before the accident, in what document?

A: It could have been in Hansen & Rice safety files.

Q: So before the accident, the roof emergency plan would be in a Hansen & Rice plan?

A: Yes.

Q: Do you have a recollection of checking on that?

A: No, I don't.

Q: Did you approve it?

A: No, not that I'm aware of.

Q: Did Wal-Mart have any roof emergency plan before the accident?

A: No, that would be up to the contractor.

Plaintiff's Exhibit B, Larry Brown's Deposition at 137. Hansen-Rice also had its own safety manual that it assembled and its own Emergency Response Plan. *See* Plaintiff's Exhibit Q, Carlus Nelson's Deposition at 33-35; Plaintiff's Exhibit H. The safety manual contained a form for Hansen-Rice's own daily site inspections. *See* Plaintiff's Exhibit Q, Carlus Nelson's Deposition at 107-109. Hansen-Rice's own Daily Work/Weekly Safety sheets were filled out. *See* Plaintiff's Exhibit JJ. It was through Hansen-Rice that its employees received instruction in safety orientation, roofing in general, B-decking, training in fall prevention-roof-ladders and scaffolds, and task training in roof work. *See* Defendants' Exhibit H-1 through H-5.

Wal-Mart did not have to approve if Hansen-Rice shut down the job because of

thunderstorms.[18]  It was also up to the contractor to allow its employees to return to work after a

storm had passed and the safety committee had given the notice that the storm had passed.

> Q: And is it Wal-Mart who clears when a storm is done and let's people go back to work?
>
> A: No, that's up to the contractor.
>
> Q: This document says workers will return to work only after it has been cleared by Wal-Mart Construction Manager and the Safety Committee.
>     Do you work with the Safety Committee to decide when it's clear?
>
> A: They all agree when it's clear, yes. I mean, as far as the safety, not necessarily myself or Thurman, but, I mean, it's up to the Safety Committee to decide is it cleared up, you know, that the storm has passed, it's okay to go back to work.
>
> Q: Do you have a say in that?
>
> A: No.
>
> Q: Do you attend Safety Committee meetings?
>
> A: Some of them.  Thurman attended most of them.

*Id.* at 177-178.  Ms. Ross described her duties as Wal-Mart's Construction Safety Manager.

> I would go visit – I had a lot of travel.  I would go visit the various DC construction sites, meet with the safety committee.  We would do

---

[18]Larry Brown testified as follows:

> Q: Did Wal Mart have to approve if Hansen & Rice shut down the job because of thunderstorms?
>
> A: No.
>
> Q: So Hansen & Rice could do that without asking you?
>
> A: Yes.

Plaintiff's Exhibit B, Larry Brown's Deposition at 167.

> a site inspection. I would meet with Wal-Mart construction managers
> to discuss what we found. I would attend the progress meeting, the
> weekly progress meeting, and we would discuss the findings that we
> had on the site inspection. I would do a safety file review of all the
> primary contractors' safety files. And not every time but sometimes
> we would have training. I would conduct some training or a member
> of the safety committee would conduct training for the safety
> committee. Also I worked in conjunction with Liberty Mutual and
> Aon for our OCIP program.

Plaintiff's Exhibit D, Cynthia Ross' Deposition at 65.

It would be a contractor's preference as to whether or not stair towers would be used on some buildings and not others, though Wal-Mart could tell a contractor to put up a stair tower. *See* Plaintiff's Exhibit D, Cynthia Ross' Deposition at 102-103.

Wal-Mart had a series of Contractor's Safety Requirements for implementing a Contractor Safety Program. *See* Plaintiff's Exhibit E. Wal-Mart required monthly inspection of extension cords, and it had an emergency action plan which had been drafted by the safety committee. *See* Plaintiff's Exhibit Q, Carlus Nelson's Deposition at 154-158. There were Owner Controlled Insurance Programs, general site, environmental, safety, and health requirements that all contractors and subcontractors were to follow. *See* Plaintiff's Exhibit GG.

It is evident that although there was a Wal-Mart presence at the Center every day, the Wal-Mart employees did not give any instruction to Hansen-Rice or its employees as to the manner of doing the actual roofing work Hansen-Rice was hired to do. Though Wal-Mart had a number of safety provisions it required of its independent contractors, it was the safety committee that specifically addressed safety issues at the site. Wal-Mart's inspection rights, that were to insure that its contractors performed their work safely, are insufficient to meet the requirements of the retained control exception. Hansen-Rice, and Wal-Mart's other contractors, controlled the manner of

21

performance of their tasks. Simply directing a contractor's employee to make a change if something was not clean enough, safe enough, or not up to the observer's standards do not rise to the level of retention of control over a contractor's work. *See Warnick*, 516 F.Supp.2d at 468. Wal-Mart did not instruct Hansen-Rice employees on how to install the metal roofing. Because Wal-Mart did not retain control over the methods of Hansen-Rice's work. It did not "retain control" over the work site sufficient to impose liability.

    b. "Peculiar Risk Exception"

"The 'peculiar risk' exception applies if the work to be done by the independent contractor involves a special or peculiar risk." *Warnick*, 516 F.Supp.2d at 469. Such a peculiar risk exists when "(1) the risk is foreseeable to the owner at the time the contract is executed and (2) the risk is different from the usual and ordinary risk associated with the general type of work done". *Id.* It goes without saying that all construction work involves some risk of harm; however, this exception, like others, should be viewed narrowly. Only when the work is done under unusually dangerous circumstances does it involve a "special risk" or "peculiar risk". *Id.*

> In most of the cases in which the plaintiff unavailingly points to the "peculiar risk" doctrine, the employee was performing routine construction work without the proper safety precautions when he injured himself. Courts have declined to apply the doctrine to this factual scenario; for the doctrine to apply, the employee must have been performing work that entailed risks different from the ordinary risks associated with the employee's usual work. Violations of safety conditions-whether by the employee or his employer, the contractor- are not a basis for invoking the doctrine.

*Warnick*, 516 F.Supp.2d at 469-470.

Here, the work that Mr. Zuno was performing consisted of tasks routine to his occupation. He was securing metal decking and other loose materials to the roof prior to leaving the area to avoid

22

the oncoming storm.  What made his job risky, of course, was the ferocity of the storm and its strong winds.  Knowing what to do to prepare for incoming inclement weather is something routine in the life of a roofer, and it was something for which Plaintiff was trained.  *See* Defendants' Exhibit H-5.  The peculiar risk doctrine does not apply to Mr. Zuno's tragic accident.

The storm which occurred in Pottsville, Pennsylvania on July 27, 2005, was an obvious danger, known to all at the site.  Wal-Mart did not retain control over the worksite, and the tasks performed by Plaintiff could not be called particularly risky.  Wal-Mart had no duty to Hansen-Rice or to Mr. Zuno that would make it liable for Plaintiff for his injuries suffered that day.

3.  Relationship of the Wal-Mart Defendants

The relationship of the Wal-Mart Defendants to each other and to Hansen-Rice and Mr. Zuno has been the topic of much discussion among the parties.  Geoff Edwards, a Wal-Mart corporate designee testified as follows:

> Q: Would you be able to list the operating entities of Wal-Mart Stores, Inc. for me?
>
> A: Sure.  Wal-Mart Stores, Inc. is an operating entity.  It operates its stores and other facilities.  Wal-Mart Stores East, LP is one of our operating entities. . . .
>
> . . . . .
>
> Q: You said Wal-Mart Stores, Inc. was an operating company also, correct?
>
> A: Yes, sir.
>
> Q: And what is its business when it serves as an operating company?
>
> A: It owns and operates retail stores and distribution centers and other facilities.
>
> Q: Does it own and operate any retail stores in Pennsylvania?

A: I couldn't state that definitively, sir.

Q: Does it operate any distribution centers in Pennsylvania?

A: Again, I couldn't state that definitively without checking the title of all of those properties.

Q: There was a company listed on some paperwork that I received in this case called Wal-Mart Stores East, Inc. Have you ever heard of such an entity?

A: Yes, sir.

Q: Does it still exist?

A: Yes, sir.

Q: Was it a wholly owned subsidiary of Wal-Mart Stores, Inc.?

MR. SORCE: When, currently?

MR. ORLANDO: Currently, I guess.

WITNESS: Yes, it is.

BY MR. ORLANDO:

Q: Has it always been?

A: Yes, Sir.

. . . . .

Q: Does Wal-Mart Stores East, Inc. have a principal place of business?

A: In Bentonville, Arkansas.

Q: What is there?   What does Wal-Mart Stores East, Inc. have in Bentonville?

A: Its principal place of business.  It's essentially a holding company.

. . . . .

Q: And what does it do?

24

A: It's a holding company.   It holds shares in other Wal-Mart operating entities that are fluid in our subsidiary structure.

Q: As a holding company does it actually operate any stores?

A: No, sir.

Q: Do you know if it is involved in building distribution centers?

MR. SORCE: Currently?

MR. ORLANDO: Then or currently.

BY MR. ORLANDO:

Q: In 2004 or 2005, or currently?

A: Not to my knowledge.

Q: Back in 2004 and 2005 did Wal-Mart Stores East, Inc. conduct business in Pennsylvania?

A: Not to my knowledge, sir.

Q: Do you know if Wal-Mart Stores East, Inc. entered into a construction contract with Hensel Phelps for the construction of a MDC in Pottsville, Pennsylvania?

A: I don't know.

. . . . .

Q: The Wal-Mart Stores East, Inc. holding company, does it hold shares of other Wal-Mart operating entities that are limited in geographical areas?

A: Yes.

Q: Can you describe the geographical limitation for me?

A: Well, Wal-Mart Stores East, Inc. holds one of its subsidiaries – it's the operating entity that generally operates stores and other facilities generally in the eastern half of the United States.  I couldn't give you the exact states without looking at a map.

Q: And what operating entity is that?

A: Wal-Mart Stores East, LP.

Q: Can you identify the limited partners in Wal-Mart Stores East, LP?

A: There is one limited partner.  It's WSE Investment, LLC.

Q: And who is that?

A: That is a single-member limited liability company organized in Delaware.  Its single member is Wal-Mart Stores East, Inc.

. . . . .

Q: Could I ask you a few questions now, sir, about Wal-Mart Stores East, LP?

A: Sure.

Q: What is its nature of business?  What does it do?

A: It owns and operates retail stores, distribution centers and other facilities related to the retail business generally in the eastern half of the United States.

. . . . .

Q: I guess my question is, does Wal-Mart Stores East, LP also operate the distribution centers after they are built?

A: Yes, sir, they do operate distribution centers.  Whether a particular distribution center was operated for it, I wouldn't know definitively, but they do operate distribution centers.

. . . . .

Q: Okay.  So let me rephrase this in my trial lawyer vernacular.  If I am incorrect, please tell me.

As I understand it, Wal-Mart Stores East, LP, the LP would be basically Wal-Mart Stores East, Inc.?

A: Well, no.  As I think I mentioned, there's a layer between Wal-Mart Stores East, Inc. and Wal-Mart Stores East, LP.

Q: That's the WSE Investment LLC?

A: That's the limited partner.

26

Q: And are there other partners?

A: There is a general partner as well.

Q: And who is the general partner?

A: It's WSE Management, LLC.

Q: And what is its business? WSE Management, LLC, what business is that in?

A: It's simply a holding company. It's a single-member LLC organized in Delaware. Its sole member is also Wal-Mart Stores East, Inc.

Q: So through those – as you said, the layer in between, we can trace Wal-Mart Stores East, LP to Wal-Mart Stores East, Inc.?

A: Correct.

Q: And Wal-Mart Stores East, Inc. is wholly owned by Wal-mart Stores, Inc.?

A: Correct. Ultimately all of these entities are wholly owed [sic] by Wal-Mart Stores, Inc.

. . . . .

Q: I'm going to ask you about another company. I saw some documentation that listed an entity as Wal-Mart Realty Company. Is that a corporate entity?

A: Yes, sir.

. . . . .

Q: Is it a subsidiary?

A: Of Wal-Mart Stores, Inc.? Yes, sir.

Q: Is it wholly owned by Wal-Mart Stores, Inc.?

A: Yes, sir.

Q: Do you know why it was formed, what purpose it serves?

A: My understanding is that it holds title to what we call dark stores,

27

which are stores that are not operating, or no longer operating, that
hold titles of those properties and possibly markets those properties
for resale or release.

Defendants' Exhibit E.  All this being said, as I find no liability regarding the Wal-Mart Defendants,

Wal-Mart Stores, Inc. and Wal-Mart Stores East, LP, I find no liability with the Wal-Mart

Defendants, Wal-Mart Stores East, Inc. and Wal-Realty Company, whose relationship with Mr. Zuno

is distant, at best.

## IV. **CONCLUSION**

Consistent with the above discussion, the motion for summary judgment filed by Defendants

is granted.